**iTELLIGENCE, INC.**,

        Plaintiff,

vs.                                           Civil Action No. 09-CV-832

**BRADLEY CORPORATION**,

        Defendant.

## ANSWER AND COUNTERCLAIM

Defendant Bradley Corporation, by its undersigned attorneys, as and for its answer to the complaint of plaintiff itelligence, Inc., admits, denies, alleges, and shows to the Court as follows:

1-2. Bradley admits the allegations set forth in paragraphs 1 and 2 of the complaint.

3-4. Bradley alleges that the allegations set forth in paragraphs 3 and 4 of the complaint state legal conclusions that need not be admitted or denied; and further affirmatively alleges that by order of the United States District Court for the Northern District of Illinois, this case has been transferred to the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1404(a) for the convenience of parties and witnesses and in the interests of justice.

5. As to paragraph 5 of the counterclaim, Bradley admits that it regularly conducts business in the State of Illinois; denies that the referenced contract was in part negotiated in the State of Illinois; alleges that it lacks knowledge or information sufficient to

form a belief as to the truth of the allegation that the referenced contract was in part performed in the State of Illinois; and otherwise denies each and every remaining allegation set forth in said paragraph 5.

7. As to paragraph 6 of the complaint, Bradley alleges that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning the range of SAP services performed by itelligence, the number of SAP projects successfully implemented by itelligence, and the number of companies involved in those projects; and otherwise admits the remaining allegations set forth in said paragraph 6.

7. As to paragraph 7 of the complaint, Bradley admits that it is engaged in the business of manufacturing commercial plumbing fixtures and washroom accessories; admits that it sought to acquire the benefits of SAP ERP software for its business; alleges that the allegation that it sought to make such software available "to its users . . . in several areas of its business" is not sufficiently clear to be admitted or denied and accordingly alleges that it lacks knowledge or information sufficient to form a belief as to the truth of the same; and otherwise denies each and every remaining allegation set forth in said paragraph 7.

8. As to paragraph 8 of the complaint, Bradley admits that it entered into a Master Agreement with itelligence with an effective date of December 7, 2007; denies that a copy of that agreement was attached to the complaint originally filed in court or served on Bradley; and otherwise denies each and every remaining allegation set forth in said paragraph 8.

9. As to paragraph 9 of the complaint, Bradley alleges that the Master Agreement is in writing and speaks for itself, admits the allegations set forth in said paragraph 9 regarding the terms and contents of such Master Agreement insofar as the same are congruent

2

therewith, and otherwise denies each and every such allegation; and denies each and every remaining allegation set forth in said paragraph 9.

10. As to paragraph 10 of the complaint, Bradley admits that itelligence agreed to provide services and deliver results described in a Project Governance Statement of Work dated December 7, 2007 and a Statement of Work dated October 29, 2008; denies that copies of either document were attached to the complaint originally filed in court or served on Bradley; and otherwise denies each and every remaining allegation set forth in said paragraph 10.

11. As to paragraph 11 of the complaint, Bradley admits that it requested certain modifications and changes; denies that any such modifications or changes were outside the scope of the services defined in the Project Governance SOW and the Phase I SOW, affirmatively alleging in this respect that the definition of "Services" expressly contemplated services going beyond those described with particularity or otherwise specifically identified in the Statements of Work but that were nevertheless necessary to comply with the terms of the Master Agreement, and that such requests are not material to the claims in issue here; alleges that the allegation that it made "numerous" such requests is too indefinite and ambiguous to be intelligently admitted or denied and accordingly alleges that it lacks knowledge or information sufficient to form a belief as to the truth of the same; denies that any requests that it made could mitigate, excuse, or explain itelligence's defaults and failures of performance, affirmatively alleging in this regard that itelligence defaulted on its core obligations to deliver usable adaptations and configurations in December, 2008, and no changes requested or approved by Bradley could explain defaults that had become inevitable; admits that it executed documentation memorializing the changes it requested; denies that such requests were "out of scope services" to

3

MILW_9201743.1

Case 2:09-cv-00832-LA   Filed 08/28/09   Page 3 of 20   Document 33

the extent that term implies that they involved services outside the definition of "Services" in the relevant documentation, and otherwise alleges that that term, to the extent it is understood to mean anything else, is too ambiguous and unclear to be intelligently admitted or denied and accordingly alleges that it lacks knowledge or information sufficient to form a belief as to the truth of the same; denies that copies of any of the referenced documentation were attached to the complaint as originally filed and served on Bradley; and otherwise denies each and every remaining allegation set forth in said paragraph 11.

12-17. As to paragraphs 12 through 17 of the complaint, Bradley alleges that the Master Agreement and other referenced agreements and documentation are in writing and speak for themselves, admits the allegations set forth in said paragraphs 12 through 17 concerning the terms and contents of such documents insofar as the same are congruent therewith, and otherwise denies each and every such allegation; and denies each and every remaining allegation set forth in said paragraphs 12 through 17.

## BREACH OF CONTRACT CLAIM

18. Bradley denies each and every allegation set forth in paragraph 18 of the complaint.

19. As to paragraph 19 of the complaint, Bradley admits that by letter dated April 29, 2009 it terminated the Master Agreement effective the following day; admits that this termination took place after itelligence had sent bills, affirmatively alleging in this regard that these bills were in many if not, in fact, in all cases disputed; denies that, except insofar as encompassed by the foregoing admission, itelligence "had asserted its right to payment" of such bills prior to the termination, affirmatively alleging in this regard that, on the contrary, itelligence had acquiesced in non-payment or deferral of payment pending efforts to correct the problems

4

caused by itelligence's defaults; denies that any such payments were past due at the time of termination; and otherwise denies each and every remaining allegation set forth in said paragraph 19.

20. As to paragraph 20 of the complaint, Bradley denies that its termination of the Master Agreement or the Statements of Work was premature, improperly noticed, or otherwise wrongful in any respect; denies that the Master Agreement forbade Bradley to fire itelligence when it did; alleges that the allegation that no FDR panel was "fully constituted" is too vague to be intelligently admitted or denied and accordingly alleges that it lacks knowledge or information sufficient to form a belief as to the truth of the same; admits that no FDR panel had issued a report; denies that the panel had not even begun the fact-finding process; and otherwise denies each and every remaining allegation set forth in said paragraph 20.

21-22. Bradley denies each and every allegation set forth in paragraphs 21 and 22 of the complaint.

23. Bradley admits the allegations set forth in paragraph 23 of the complaint, affirmatively alleging in this respect, however, that the waiver was properly agreed to only upon Bradley's execution of the same.

## **AFFIRMATIVE DEFENSES**

As and for its affirmative defenses to plaintiff's complaint, Bradley alleges and shows to the Court as follows:

24. Plaintiff has alleged without qualification that the alternative dispute resolution provisions in the agreement between the parties were waived by agreement of the parties. That waiver was effective according to its terms as of April 29, 2009. itelligence's affirmative allegation of a waiver effective by its terms as of April 29, 2009 constitutes a judicial

5

admission binding upon itelligence, Inc., which it is estopped to deny. As a result, the claim of itelligence, Inc. for breach of the alternative dispute resolution provisions in the agreement between the parties is barred by waiver or, in the alternative, by estoppel, and itelligence has failed to state a claim upon which relief could be granted for premature or otherwise wrongful termination.

25. Quite apart from the formal waiver agreement alleged by itelligence, the initiation of the instant litigation by itelligence on May 5, 2009, without resort to any alternative dispute resolution process, waived any right it would otherwise have had to complain about failure to pursue that process. itelligence has failed to allege any facts from which a reasonable jury could conclude that itelligence suffered any legally cognizable damages between April 29, 2009 and May 5, 2009. Accordingly, to the extent (if any) that itelligence's claim for breach of the alternative dispute resolution provisions in the agreement between the parties is not barred by express waiver, it is barred by implied waiver and by failure to state a claim upon which relief can be granted.

26. For the reasons set forth more fully in Bradley's counterclaim in this action, the terms of which are incorporated herein by reference as if set forth in full, Bradley is entitled to setoffs against the claims asserted by itelligence which vastly exceed any entitlement itelligence would have on the claims that it asserted in its complaint, if and to the extent those claims were legally valid.

27. In the spring of 2009, after a long and frustrating series of failures to achieve the requirements and objectives defined by the parties in their agreement and afterward, itelligence threatened to remove a majority of its personnel from Bradley and to terminate its participation in the project contemplated by the parties' agreement, and in fact did remove key

6

personnel who were working on critical and unfinished tasks. This represented an anticipatory repudiation of itelligence's obligations under the agreement. It destroyed the essence of the bargain between the parties, and accordingly relieved Bradley of any obligation it might otherwise have had to perform any further executory obligations under the agreement, including without limitation those alleged requirements and obligations that are the subject of itelligence's complaint.

28. itelligence has failed to mitigate its damages, if any.

29. Bradley alleges upon information and belief that a material portion of the fees that itelligence contends were unpaid were improperly asserted, were promptly protested by Bradley on that ground, and were not thereafter pursued by itelligence, either through the alternative dispute resolution procedure provided for in the agreement between the parties or in any other fashion. To that extent, itelligence's claim for unpaid fees is barred by laches, acquiescence, and implicit admission that the fees were not in fact proper.

30. itelligence has contributed by its own fault to its injury, if any, and is barred by such contributory fault from the whole or, in the alternative, from a material portion of the recovery it seeks herein.

31. For the reasons set forth more fully in Bradley's counterclaim in this action, the terms of which are incorporated herein by reference as if set forth in full, itelligence's claims are barred by failure of consideration.

## COUNTERCLAIM

Defendant Bradley Corporation, by its undersigned attorneys, as and for its counterclaim against plaintiff itelligence, Inc., alleges and shows to the Court as follows:

## NATURE OF BRADLEY'S CLAIM

32. Bradley seeks recovery for breach by itelligence of obligations to develop, implement, deliver, install, and achieve functionality for a major computer program called for by a Master Agreement between the parties entered into on or about December 7, 2007 ("the Project"); and for misrepresentations of material fact made by itelligence in inducing Bradley to enter into that Agreement.

## BACKGROUND ALLEGATIONS

33. On or about December 7, 2007, Bradley and itelligence entered into a written contract called the "Master Agreement" which included, although it was not limited to, Statements of Work ("SOW") for (a) overall Project governance; (b) the preparation phase and business blueprint phase of the Project; and (c) the realization, final preparation, and go-live support phases of the Project. This written contract, including all of its components, is referred to hereafter in this counterclaim as "the Agreement".

34. The undertakings of itelligence in the Agreement included, although they were not limited to, customizing, configuring, developing, implementing, supporting, delivering, installing, and achieving functionality for an enterprise resource planning ("ERP") computer software system that, in addition to features that are usually part of ERP systems, would include E-commerce and Business Intelligence capabilities providing Bradley with, among other benefits, real-time, integrated, business-wide access to business data through defined reports, interfaces, conversions, enhancements, forms, and workflows ("RICEF") conforming to identified criteria.

8

35. The importance of this Project was known to and clearly understood by itelligence, as were Bradley's specific objectives in entering into the Agreement. Those objectives included, without limitation,

(a) material improvement in: resource utilization efficiency; cost and cash-flow control; flexibility; availability of key company metrics, sales information, and other business information; and data coordination; and

(b) reduction in: waste; inventory deviations; processes; and the number of different legacy systems.

itelligence expressed its understanding of these objectives and their importance in the course of numerous pre-sales presentations to Bradley as well as in itelligence's representations, in its response to Bradley's request for proposal ("RFP"), of itelligence's capacities and familiarity with the requirements for customized implementation processes of this kind.

36. Once under contract with Bradley, and in light of these and other requirements and objectives, itelligence specifically undertook to prepare a Business Blueprint Document ("BBD") with Bradley's assistance that would describe (a) software functionality; (b) the RICEFs; and (c) Bradley's organizational structure, future business process flows, and related end-user roles, all of which were to be delivered to Bradley by itelligence as part of the Services.

37. Both parties recognized from the beginning, as an integral part of their understanding, that the ERP Project was a complex undertaking requiring expertise in implementation of the applicable SAP ERP software licensed to Bradley. When it is delivered, SAP ERP software is comprised of business applications that require adaptation and

9

MILW_9201743.1

Case 2:09-cv-00832-LA Filed 08/28/09 Page 9 of 20 Document 33

customization to fit a customer's business operations. It is only after the adaptation/ customization process is completed that the customer has a usable software system that will serve the customer's business needs. In other words, the system as sold is not usable for the purchasing customer and must be modified to fit that customer's particular business operations. This means that, during implementation of the SAP ERP software, the implementing vendor must lead a substantial effort to identify and gather required customer data, analyze the customer's data requirements and systems so that it can design detailed and effective plans to properly configure and adapt/customize the modules of the SAP ERP software to fit the operational and functional needs of the customer, and then carry those plans out. In entering into the Agreement with itelligence, Bradley relied upon what itelligence professed to be (1) its special skill, expertise, knowledge, background, and experience in the specific fields and market segment implicated by the Project, (2) its specialized approach to implementation that facilitates time-effective and cost-effective projects performed in a manner consistent with industry best practices, and (3) its claimed capacity to deliver the SAP ERP software to Bradley as an integrated system that would meet Bradley's business objectives. Upon delivery of itelligence's first version of this Blueprint, in an effort to be certain that itelligence understood the specifications defined in it and would be able to deliver functionality meeting those specifications, Bradley asked itelligence to devote several additional days to defining the required goals and objectives more clearly, and itelligence agreed to do so.

38. Following agreement on the Blueprint, itelligence moved into the realization phase of the Project. From this point forward, the Project was marked by defaults on the part of itelligence, including but not limited to:

(a) Repeated and recurrent failures of performance;

(b) Use of an implementation methodology that was inconsistent with industry standards and best practices for implementing SAP;

(c) Repeated unauthorized turnover of Project managers and nearly 100% turnover among other key personnel assigned to the Project by itelligence, with multiple turnover in some critical positions, all occurring without adequate or appropriate transition documentation and effort, and outright removal of itelligence personnel and resources from the Project without replacement;

(d) Failure to deploy even the most basic project management and scheduling tools, including but not limited to collaborative project scheduling, work plans, task lists, dependencies, resource planning, monitoring, written approvals, and weekly updates;

(e) Missed timelines, causing Project schedule delays;

(f) Uncontrolled and increasing Project costs;

(g) Refusal or other failure to deliver a number of solutions specified in the BBD, including but not limited to failure to deliver by November-December, 2008 the RICEFs specified in Appendix A of the Statement of Work;

(h) Failure to complete documentation, knowledge transfer, and other deliverables;

(i) Failures in delivery of implementation services; and

(j) Threats by itelligence to abandon the Project, and implementation of such threats to the extent of actually withdrawing most of the consultants it had

11

assigned to the Project, unless Bradley agreed to demands not authorized by and in some cases flatly forbidden by the Agreement, such as (among others) itelligence's demand that it be paid on a time-and-materials basis, in direct contravention of the risk-share payment structure expressly agreed to by the parties.

39. Although Bradley sought repeatedly to identify problems and work with itelligence to remedy its failures, and contributed internal resources of its own to pursuit of the Project, Bradley finally determined that the Project could not be successfully completed by itelligence in accordance with the terms of the Agreement.

40. On April 29, 2009, more than thirty days after written notification of material breach and after failure by itelligence to cure any of the material breaches specified, Bradley formally notified itelligence that it was terminated effective the following day, April 30, 2009, pursuant to the termination-for-cause provision in the Agreement, subject only to itelligence's contractual obligation to assist in transition to a new provider of the services still required for completion of the Project.

## FIRST CLAIM FOR RELIEF
### Breach of Express Contract

41. Bradley re-alleges and incorporates by reference as if set forth fully herein the allegations set forth in paragraphs 32 through 40 of this counterclaim.

42. Defendant itelligence breached the Agreement between the parties in the following respects, among others:

(a) It failed to deliver, install, and achieve functionality for a system meeting the requirements and criteria contemplated by the Agreement;

12

MILW_9201743.1

Case 2:09-cv-00832-LA    Filed 08/28/09    Page 12 of 20    Document 33

(b) It failed to complete the programming required and failed to deliver the functionality specified in the BBD;

(c) It fell materially short of agreed-upon RICEF specifications, and failed to deliver RICEFs in timely fashion;

(d) It repeatedly missed essential deadlines and caused Project schedule delays;

(e) It failed to provide Bradley with information and assistance necessary for Bradley to complete tasks that the Agreement called for Bradley to complete;

(f) It failed to provide Bradley with the benefit of itelligence's professed knowledge, experience, and familiarity with best practices with respect to both SAP implementation and SAP project management in order to facilitate effective, efficient, and accurate completion of Bradley-related tasks;

(g) It repeatedly failed to deliver a detailed Project plan and Project schedule as requested by Bradley and as required by the Agreement between the parties, assigned unqualified individuals as Project managers, failed to provide leadership and guidance with respect to methodology and deliverables, and otherwise failed to provide adequate Project planning and Project management with the result that, among other deficiencies, itelligence personnel worked on various aspects of the Project in isolation, without integration with each other and with inadequate communication

across Project teams, making achievement of an integrated system – which was an essential aspect of the Project – impossible;

(h) It assigned personnel without adequate and appropriate skills, knowledge, background, experience, and capabilities to various aspects of the Project;

(i) It reassigned personnel within the Project and removed personnel from the Project altogether, at one point reaching a personnel turnover rate of nearly 100%, without appropriate authorization or adequate knowledge transfer and transition efforts between the previous personnel and their replacements, and in some cases failed to replace departing personnel with similarly or appropriately qualified personnel or to replace them at all, resulting in (among other problems) loss of the benefit of experience with the Project and further delays; and

(j) It threatened to abandon the Project and to remove all or virtually all personnel from the site unless Bradley complied with demands to pay charges it was under no obligation to pay and on bases that Bradley was under no obligation to accept, and otherwise departed in itelligence's favor from the terms of the Agreement and, when Bradley refused to acquiesce in those demands, did in fact pull most of its consultants from the Project for several weeks, in substantial implementation of this threat.

43. Bradley has done all things on its part necessary to be performed under and pursuant to the Agreement between the parties or, to the extent (if any) that such performance has not occurred, its non-occurrence has been caused by itelligence's defaults or has

14

MILW_9201743.1

Case 2:09-cv-00832-LA   Filed 08/28/09   Page 14 of 20   Document 33

otherwise been excused or is immaterial, and all conditions to the liability of itelligence under such Agreement have been performed or have otherwise occurred.

44. Bradley has been damaged by itelligence's breaches of the Agreement, in amounts that have not yet been fully determined but that are capable of ascertainment to a reasonable degree of legal certainty in that, among other things, it has not received the benefit of its bargain, it has been forced to spend money out of pocket and to bear the cost of time, effort, and expenditure of materials of and by its own employees and a number of non-itelligence consultants whose work was dependent on itelligence's performance, in efforts to correct or otherwise deal with itelligence's defaults, and the attention of key, valued employees has been diverted from their appropriate tasks to attempts to deal with the problems created by itelligence. Bradley is entitled to recover such damages from itelligence.

45. Despite due demand therefor, itelligence has without legal justification or excuse failed and refused to pay Bradley the whole or any portion of the damages that its defaults have caused Bradley.

## SECOND CLAIM FOR RELIEF
### Misrepresentation

46. Bradley realleges and incorporates by reference as is set forth fully herein the allegations in paragraphs 32 through 45 hereof.

47. Prior to entry into the Master Agreement, at meetings held at Bradley's headquarters in Menomonee Falls, Wisconsin, in January, March, May, and July, 2007, and in written material sent to Bradley, itelligence, through agents and employees authorized to speak on its behalf, made the following representations (among others) to Bradley concerning itelligence's then existing resources and capability:

15

MILW_9201743.1

(a) that prototypes used by itelligence in its July, 2007 demonstration of its capabilities were available for immediate implementation;

(b) that itelligence had the resources and capability to customize the SAP software to enable it to perform particular functions performed by software demonstrated by a competing vendor called Epicore, specifically asserting that, "Functionality is fully contained in the software.";

(c) that the SAP software was capable, out of the box, of meeting all of the critical requirements that Bradley had identified in the request for proposal process and the follow-up to that process;

(d) that, with respect to Bradley's more detailed requirements, far less adaptation and customization of the SAP software would be required than was in fact required, and that the SAP configuration would permit customization to be minimized;

(e) that all data concerning a given customer could be collected in a single, readily navigated data base;

(f) that a Beta-version of navigation software that itelligence demonstrated in July would be available in its final form by November, 2007, when in fact it would not become available at all until May, 2008, and would not become available to itelligence until the fall of 2008;

(g) that itelligence had the capability and resources to match the "Smart Part" feature offered by one of its competitors; and

16

(h) that itelligence had the capability and resources readily to tie various components of the implementation process together, when in fact neither itelligence nor any of its consultants could accomplish this.

48. These representations, and each of them, were representations of present and existing fact, concerning matters as to which, upon information and belief, itelligence had actual knowledge, or purported to have actual knowledge, or in the exercise of reasonable care should have had actual knowledge.

49. The representations of fact referred to above, and each of them, were false, in that the software was not in fact capable of meeting all of Bradley's critical requirements without substantial customization and was not in fact capable of meeting Bradley's more detailed requirements without extensive customization, and did not otherwise conform to itelligence's descriptions of it; and in that itelligence did not in fact, at the time the representations were made or at any material time thereafter, have the abilities and resources that it represented itself as having, or, in the case of representations concerning future events, upon information and belief did not have an actual subjective belief or, in the alternative, a reasonable basis for an actual subjective belief that such events would occur.

50. The representations referred to above were made as part of the competitive bidding process for securing the software services provision contract that was ultimately embodied in the Master Agreement.

51. Bradley alleges upon information and belief that, at the time the representations and each of them referred to above were made, itelligence knew that they were false or, in the alternative, in the exercise of reasonable care should have known that they were false or, in the alternative, that itelligence made the statements as of its own knowledge with

17

respect to matters as to which it purported to have knowledge, and in connection with a transaction in which it had a financial interest.

52. Bradley alleges upon information and belief that itelligence made the representations referred to above, and each of them, with the intent to deceive Bradley.

53. Bradley exercised reasonable care for its own protection, but it was nevertheless deceived by the misrepresentations made by itelligence and by each of those misrepresentations individually.

54. The misrepresentations referred to above were material in that, but for those misrepresentations, and each of them, Bradley would not have entered into the Master Agreement with itelligence.

55. The principal subject matter of the Master Agreement, which Bradley was induced to enter into by itelligence's misrepresentations, was the provision of services by itelligence, as opposed to the sale of goods.

56. Bradley has been damaged by the misrepresentations referred to above in amounts that have not been fully determined but that are capable of ascertainment to a reasonable degree of legal certainty.

57. By reason of Bradley's material, reasonable, and detrimental reliance upon the representations made to it by itelligence, itelligence is liable to Bradley for actual and punitive damages, on the basis of intentional misrepresentation or, in the alternative, negligent misrepresentative or, in the alternative, strict responsibility misrepresentation.

18

MILW_9201743.1

Case 2:09-cv-00832-LA   Filed 08/28/09   Page 18 of 20   Document 33

### THIRD CLAIM FOR RELIEF
### Statutory False Advertising

58. Bradley realleges and incorporates by reference as if set fully herein the allegations set forth in paragraphs 32 through 57 hereof.

59. The Bradley executives to whom the misrepresentations referred to above were made, and Bradley itself, were members of the public within the meaning of Wis. Stat. § 100.18(1) at the time of such representations and at all other times pertinent hereto.

60. The representations described above, and each of them, contained one or more statements or representations relating to Bradley's purchase of itelligence's services that were untrue, deceptive, or misleading within the meaning of Wis. Stat. § 100.18(1), and thus violated that statute.

61. itelligence made the representations described above, and each of them, with the intent and for the purpose of selling specified services to Bradley and of inducing Bradley to enter into a contract with itelligence relating to the purchase of services from itelligence.

62. The representations described above, and each of them related to the sale and purchase of the services described in paragraph 63 hereof.

63. itelligence made or caused to be made the representations described above in the State of Wisconsin.

64. Because of Bradley's reasonable, material and detrimental reliance upon the misrepresentations of itelligence described above, Bradley has suffered pecuniary loss as a result of itelligence's violations of Wis. Stats. § 100.18(1), in amounts that have not yet been fully determined but are capable of ascertainment to a reasonable degree of legal certainty, and

19

accordingly is entitled to recover the same from itelligence pursuant to Wis. Stats. § 100.18(11)(b)2.

WHEREFORE, Bradley demands judgment against itelligence, as follows:

(a) dismissing itelligence's complaint on its merits and with prejudice;

(b) awarding Bradley its damages as shown by the proof;

(c) in the amount of such punitive damages as may be assessed by the trier of fact on the alternative intentional and negligent misrepresentation claims included in Bradley's second claim for relief;

(d) for interest according to the proof;

(e) in the amount of its actual costs, disbursements, and reasonable attorney's fees or, in the alternative, such costs, disbursements, and attorneys' fees as are allowed by law; and,

(f) for such other and further relief as this Court may deem meet and just.

Dated this 28th day of August, 2009.

s/ Michael A. Bowen
Michael A. Bowen, Bar Number: 1016965
**Attorneys for Defendant**
Foley & Lardner LLP
777 East Wisconsin Avenue
Milwaukee WI 53202-5306
Telephone: (414) 271-2400 (general)
Telephone: (414) 297-5538 (direct)
Facsimile: (414) 297-4900
E-mail: mbowen@foley.com